Edwin F. McPherson – State Bar No. 106084
emcpherson@mcpherson-llp.com
Pierre B. Pine – State Bar No. 211299
ppine@mcpherson-llp.com
**McPHERSON LLP**
1801 Century Park East
24th Floor
Los Angeles, CA 90067
Tel:(310)553-8833
Fax:(310)553-9233

Attorneys for Plaintiff ALAN U. SCHWARTZ, TRUSTEE OF THE TRUST UNDER ARTICLE THREE OF THE LAST WILL AND TESTAMENT OF TRUMAN CAPOTE DATED MAY 4, 1981

# UNITED STATES DISTRICT COURT

# FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| ALAN U. SCHWARTZ, TRUSTEE OF THE TRUST UNDER ARTICLE THREE OF THE LAST WILL AND TESTAMENT OF TRUMAN CAPOTE DATED MAY 4, 1981, <br><br> Plaintiff, <br><br> v. <br><br> PARAMOUNT PICTURES CORPORATION, a Delaware corporation, inclusive, <br><br> Defendants. | CASE NO.: 2:20-cv-11470-SB-JPR <br><br> Assigned To Hon. Stanley Blumenfeld, Jr. <br><br> **FIRST AMENDED COMPLAINT FOR DECLARATORY RELIEF** |

Plaintiff ALAN U. SCHWARTZ, TRUSTEE OF THE TRUMAN CAPOTE LITERARY TRUST UNDER ARTICLE THREE OF THE LAST WILL AND TESTAMENT OF TRUMAN CAPOTE DATED MAY 4, 1981 (hereinafter "Plaintiff") complains and alleges as follows:

# INTRODUCTION

1.     Plaintiff is the Trustee of a charitable trust, set up by Truman Capote. Capote is the author who conceived "Breakfast at Tiffany's," which ultimately became the iconic motion picture of the same name, which was produced by Paramount in 1961.

2.     Any and all rights that Paramount owned in connection with "Breakfast at Tiffany's" reverted to Capote's Executor upon Capote's death in 1984, and ultimately transferred to Plaintiff.

3.     In 1991, Plaintiff and the Capote Estate entered into an agreement with Paramount, whereby Paramount optioned certain sequel and prequel rights, among others, with respect to the film. The agreement provided that, if a motion picture was not produced within a certain amount of time, the rights would revert back to Plaintiff.

4.     Paramount did not produce a motion picture within the stated time period, and the rights have reverted back to Plaintiff. Paramount therefore has no rights with respect to any of Capote's Work other than to continue to exploit the original "Breakfast at Tiffany's" film.

5.     However, Paramount claims that no reversion occurred, that it had the right, but not the obligation, to produce a film, and that it purchased this right for $300,000.00. What is most inconceivable, however, is that Paramount claims that whether or not it had an actual obligation to exploit Plaintiff's valuable film rights depended exclusively on the timing of its acquisition payment.

# PARTIES

6.     Plaintiff is, and at all times herein mentioned was, an individual, residing in the State of California, County of Los Angeles, and the Trustee of the Truman Capote Literary Trust under Article Three of the Last Will and Testament of Truman Capote Dated May 4, 1981 (hereinafter the "Trust").

///
///

7. Plaintiff is informed and believes and, based upon such information and belief, alleges that Defendant PARAMOUNT PICTURES CORPORATION (hereinafter "Paramount") is, and at all times herein mentioned was, a corporation, organized and existing under the laws of the State of Delaware, and is, and at all times herein mentioned was, doing business in the State of California, County of Los Angeles.

8. Plaintiff is informed and believes and, based on such information and belief, alleges that Defendants, and each of them, are, and at all times herein mentioned were, the alter egos, agents, employees, partners, joint-venturers, co-conspirators, owners, principals, and employers of the remaining Defendants, and each of them, and are, and at all times herein mentioned were, acting within the course and scope of that agency, employment, partnership, conspiracy, ownership, or joint-venture. Plaintiff is further informed and believes and, based upon such information and belief, alleges that the acts and conduct herein alleged of each such Defendant were known to, authorized by, and/or ratified by the other Defendants, and each of them.

## SUMMARY OF FACTS

*Truman Capote*

9. Truman Capote (hereinafter "Capote") was an American novelist, short story writer, playwright, screenwriter, and actor. He began writing short stories when he was approximately eight years old. His early stories were published in both literary quarterlies and well-known popular magazines. Several of his short stories, novels, and plays have been praised as literary classics, including *In Cold Blood*.

10. His works have been adapted into more than twenty films and television dramas. He was awarded numerous awards for his work, including two Edgar Awards from the Mystery Writers of America, an Emmy Award for Best Screenplay, and was nominated for a Writer's Guild Award for Best Written American Drama, as well as a Golden Globe for Best Acting Debut in a Motion Picture.

///

*The Trust*

11.     The Trust is a charitable trust, established in 1994 by Capote's will. In cooperation with the Iowa Writers Workshop at the University of Iowa, the Trust awards the annual Truman Capote Award for Literary Criticism in Memory of Newton Arvin. The award commemorates not only Capote but also his friend Newton Arvin, the Smith College professor and critic, who lost his job after his homosexuality was publicly exposed. The award is said to be the largest annual cash prize for literary criticism in the English language.

12.     The Trust also awards graduate level fellowships at universities such as Cornell University, the University of Iowa, the University of Alabama, and the University of North Carolina. It also funds undergraduate level scholarship programs to promote creative writing programs through various universities and colleges. The Trust's educational grantees include: Appalachian State University, University of Alabama, Brooklyn College, California Institute of the Arts, Cornell University, Institute of American Indian Arts, University of Iowa Writers' Workshop, University of Montana, Rutgers University – Newark, Xavier University of Louisiana, and Yale Law School

*History of Capote's Work*

13.     In or about 1958, Capote wrote a novella entitled "Breakfast at Tiffany's" (hereinafter the "Work"), which was originally published in *Esquire* Magazine on October 16, 1958. The Work's prose style has been praised effusively, and reportedly prompted Norman Mailer to refer to Capote as "the most perfect writer of [his] generation." Mailer has stated that he "would not have changed two words in 'Breakfast at Tiffany's.'" Capote's original typed manuscript was sold at auction in 2013 for $306,000.00.

14.     Shortly after its first publication in *Esquire*, the Work was published by Random House in a collection with three other Capote stories, and received glowing reviews. The collection has been reprinted several times.

15. The Work was registered with the U.S. Copyright Office in Capote's name on October 14, 1958, under entry No. A:358806.

16. There have been two adaptations of Capote's Work into stage plays, both directed by Sean Mathias. The first production was presented in 2009 at the Theatre Royal Haymarket in London, starring Anna Friel and Joseph Cross. The second version was presented on Broadway in 2013, at the Cort Theatre, starring Emilia Clarke, Cory Michael Smith, George Wendt. This version was also produced in the U.K. in 2016, called "a play with music," and ran at the Theatre Royal Haymarket in the West End from June to September, 2016.

***1958 Motion Picture Rights Agreement With Paramount***

17. On December 9, 1958, Capote entered into an agreement with Paramount (the "1958 Agreement"), whereby Capote granted to Paramount the right to create a motion picture as a derivative work of Capote's Work. The agreement provided the following:

> The Author [Capote] hereby conveys, grants and assigns to [Paramount] all the motion picture rights, forever and throughout the world, in and to and in connection with [the Work] . . . .

18. Pursuant to the 1958 Agreement, Paramount produced a motion picture entitled "Breakfast at Tiffany's," starring Audrey Hepburn and George Peppard (hereinafter the "Original Picture"), which was based upon, and derived from, Capote's Work.

19. The Original Picture was critically acclaimed, and won two Academy Awards, one for Best Original Score and one for Best Original Song for "Moon River." The film was also nominated for three other Academy Awards: Best Actress for Audrey Hepburn, Best Adapted Screenplay, and Best Art Direction. In 2012, the film was deemed "culturally, historically, or aesthetically significant" by the U.S. Library of

Congress, and was selected for preservation in the National Film Registry.

*Capote's Death and Succession of Renewal Rights*

20. Capote died on August 25, 1984. Pursuant to the Copyright Act of 1909, an author had the exclusive copyright in and to his/her copyrighted work for a 28-year term. Thereafter, if the author was alive during the initial renewal term, the author had the right to renew his or her exclusive copyright for an additional 28 years. (See §24 of the 1909 Act). Pursuant to the 1909 Act, the statutory succession worked as follows:

(a) If the author/owner of the copyright dies in the initial term of the work, then the spouse and/or children become the statutory successor class, with the sole right to renew said copyright.

(b) If the author/owner dies in the initial term of the copyright, childless, unwed, but testate, and the right to renew the copyright passes to the "Author's Executors," not in the executors' own right but as a fiduciary for the testamentary devisees of said copyrighted work.

(c) If the author/owner dies in the initial term of the copyrighted work, childless, unwed and intestate, the right to renew belongs to the author's "Next of Kin" under the appropriate state law of intestate succession. (See §24 of the 1909 Act).

21. Because Capote died testate in the initial term of the copyright period (1958-1986), without wife or children, the renewal term under the copyright statute passed to the Executor of his estate, as the fiduciary of the Trust established pursuant to Capote's will. After Capote's death, the copyright in the Work was therefore renewed by, and in the name of, Alan U. Schwartz, as Executor of the Estate of Truman Capote, on April 18, 1986, under entry No. RE: 291-743.

22. By an Assignment of Copyright dated July 1, 1990, Alan U. Schwartz, as Executor of the Estate of Truman Capote, assigned to the Trustee of the Trust under Article Three of the Last Will and Testament of Truman Capote dated May 4, 1981, in trust, all right, title, and interest to all of Capote's literary works, including the Work,

including "(1) all copyrights in the United States of America and all copyrights and proprietary rights therein in all other countries throughout the world; and (2) all causes of action for infringement of copyright and of other rights of whatever nature, vested or contingent, past, present and future, in and to said literary works and all of the proceeds from the foregoing, accrued and unpaid and thereafter accruing."

23. Although Capote, pursuant to the 1958 Agreement, had granted film rights in and to the Work to Paramount, including renewal rights, and although it was not explicitly set forth in the assignment documents, the grant of a U.S. copyright pursuant to statute was contingent on Capote being alive for the renewal term of his copyright period. Because the grant was only a grant of an expectancy interest, and Capote did not receive the expectancy interest, the grant of the U.S. copyright (renewal period) to Paramount had no force or effect.

24. Similarly, Capote's grant to Paramount of the right to make and distribute future productions and to continue distribution of the Original Picture during the renewal term of the copyright was also deemed to have lapsed. To be sure, on April 24, 1990, the Supreme Court of the United States decided the case of *Stewart v. Abend*, 495 U.S. 207 (1990), which held that: "if the author [of a story upon which a motion picture or other derivative work is based] dies before the renewal period, then the assignee may continue to use the original work ***only if the author's successor transfers the renewal rights to the assignee . . . .***"

25. In fact, according to *Stewart*, Paramount's continued distribution or other exploitation of the Original Picture during the renewal term would constitute an infringement of Capote's copyright. "In this case, the grant of rights in the pre-existing work lapsed and, therefore, the derivative work owner's rights to use those portions of the pre-existing work incorporated into the derivative work expired. Thus, continued use would be infringing . . . . To say otherwise is to say that the derivative work nullifies the 'force' of the copyright in the 'matter employed.'" (*Stewart*, at 236). "So long as the pre-existing work remains out of the public domain, its use is infringing if one who

employs the work does not have a valid license or assignment for use of the pre-existing work." (*Stewart*, at 223). The same goes for the production of any sequels, prequels, or remakes thereof.

26. The Trust, as Capote's heir, therefore also had its own exclusive right to produce such sequels, prequels, and remakes, or to assign those rights to third parties, and to prevent the exploitation of the Original Picture, irrespective of the express terms of the 1958 Agreement. "The renewal provisions [of the Copyright Act] were intended to give the author a second chance to obtain fair remuneration for his creative efforts and to provide the author's family a 'new estate' if the author died before the renewal period arrived. An author holds a bundle of exclusive rights in the copyrighted work, among them the right to copy and the right to incorporate the work in derivative works." (*Stewart*, at 220).

27. Plaintiff therefore regained exclusive ownership and control over very valuable intellectual property, particularly considering the success and fame of Capote's original "Breakfast at Tiffany's" story and the Original Picture. As a result of the *Stewart* decision, Paramount, on the other hand, had *lost* all ownership rights in very valuable intellectual property.

28. Paramount was therefore faced with the devastating prospect of forever losing its right to exploit the Original Picture, forever being precluded from making a sequel, prequel, or remake thereof, and forever being precluded from exploiting any television or other rights in connection with Capote's Work.

29. Desperate to re-obtain the rights to distribute the Original Picture, Paramount initially took the position that Plaintiff was <u>legally obligated</u> to negotiate a "new deal." However, Plaintiff pointed out that the *Stewart* decision quite clearly did away with any such argument. "***But nothing in the copyright statutes would prevent an author from hoarding all of his works during the term of the copyright. In fact, this Court has held that a copyright owner has the capacity arbitrarily to refuse to license one who seeks to exploit the work***." (*Stewart*, at 229) (emphasis added).

30. Plaintiff was therefore well within his rights to refuse to allow Paramount to further distribute the derivative Original Picture, to refuse to even negotiate with Paramount for such rights or sequel, etc. rights, and to sue Paramount for copyright infringement for any continued exploitation of the Original Picture or anything else that was derivative of Capote's Work.

31. Notwithstanding Plaintiff's superior bargaining position in this regard, Plaintiff, for the sake of the property, did agree to negotiate with Paramount concerning certain rights, <u>because it was extremely important to Plaintiff – and in fact was Plaintiff's primary concern – that this very valuable property be exploited properly, and actually produced and distributed</u>. Plaintiff was not interested, at any time, in having the rights tied up for an indefinite period of time with no movement on production, irrespective of who had those rights, and irrespective of how much money he received for those rights.

32. Plaintiff was willing to negotiate a new agreement that would grant Paramount the continuing right to distribute the Original Picture, and to grant an option to Paramount to allow it to produce future films based upon Capote's Work. However, it was essential that such grant of future rights would be conditional upon Paramount's actually producing at least one motion picture by a date certain.

33. By 1990-1991, the value of the future production rights of Capote's Work had greatly increased since 1957, due to the successful and iconic Original Picture, and the ongoing success of the "Breakfast at Tiffany's" story. Therefore, in 1990-1991, Plaintiff was not willing to return to the conditions set in the original 1957 Agreement between Paramount and Capote, in which the future production rights had been granted without any corresponding obligation of Paramount to actually produce any motion picture based on the Work (other than the Original Picture).

*Negotiations Leading Up To 1991 Agreement*

34. Paramount nevertheless took the position during those early negotiations that Plaintiff was improperly making "excessive financial demands," and was

"suppressing further exploitation of the film."  However, Plaintiff pointed out that that very argument had been dealt with squarely in the Stewart decision, in which the Supreme Court determined that the author or successor may suppress distribution of an existing work and make whatever demands that it wishes.  "***Others may make demands . . . which are so exorbitant that a negotiated economic accommodation will be impossible . . . .  These arguments are better addressed by Congress than the courts . . . .  Presumably, respondent is asking for a share in the proceeds because he wants to profit from the distribution of the work, not because he seeks suppression of it . . . . The limited monopoly granted to the artists is intended to provide the necessary bargaining capital to garner a fair price for the value of the works passing into public use***."  (*Stewart*, at 228-29) (emphasis added).

35.  Prior to entering into an agreement with Plaintiff in 1991, Paramount made it very clear that it intended to commence production of a remake of the Original Picture soon after the agreement was signed.  In fact, on or about March 19, 1991, less than five months prior to entering into the 1991 Agreement, Paramount entered into a separate agreement with Robert Evans to produce the remake.  When that agreement was superseded and incorporated into an overall producing deal with Paramount in July of 1991, Paramount even notified Schwartz of the same by letter dated July 8, 1991.

36.  Robert Evans, at the time, was an "A-List" producer, having personally produced "Chinatown," "Marathon Man," "Black Sunday," "Urban Cowboy," "The Cotton Club," and "The Two Jakes."  In addition, as the (previous) head of production at Paramount, Evans had also overseen "Barefoot in the Park," "The Odd Couple," "The Detective," "Rosemary's Baby," "True Grit," "The Confession," "Love Story," "Plaza Suite," "Harold and Maude," "The Godfather," "Serpico," "Save the Tiger," "The Great Gatsby," and "The Conversation."  As a studio executive, he also oversaw "The Godfather Part II."

37.  Plaintiff therefore understood that Paramount would produce the motion picture relatively quickly after signing, and certainly never intended to allow Paramount

– 10 –

to have an open-ended perpetual *right* to produce a remake or sequel without actually *producing* that motion picture.

38.  Both parties were to benefit substantially from the actual *production* of a new motion picture, and Plaintiff certainly would not have agreed to allow Paramount to sit on remake rights, while <u>not</u> producing the picture.  Moreover, Plaintiff certainly would not have done so for the mere $300,000.00 that Paramount ultimately paid, especially when Capote's original typed manuscript of the novella alone, years later, would be sold for more money.

39.  During the negotiations, Plaintiff's representative indicated that the purchase price for the rights should be "made upon the earliest of (i) exercise of the option, (ii) making a star pay-or-play or (iii) commencement of principal photography," making Plaintiff's understanding clear that the production of the remake was imminent, and that Paramount might be signing a star actor or starting filming before it even excercised the option to produce the picture.

40.  Later in the negotiations, Paramount indicated that it did not want to "tie rights payments to the vagaries of star deals," and therefore would agree to "pay the purchase price on the earlier of the option exercise or commencement of principal photography of [the remake]," thus confirming its own intent imminently to commence production of the remake.

41.  Plaintiff and Paramount also discussed the concept of Plaintiff's entering into an agreement with a third party to produce a motion picture.  Paramount demonstrated its acknowledgment that anyone tying up the rights to produce a motion picture indefinitely, without actually *producing* the picture, was antithetical to the intent of the parties, by stating the following: "***The suggestion that [Plaintiff] could tie-up the rights in perpetuity by entering into an agreement with some third party is plainly contrary to the intent of the negotiations***."

42.  Very clearly, neither party wanted there to be any tie-up in rights that would allow either party to sit on those rights and refrain from producing the picture.

*1991 Agreement Between Estate, Trust, and Paramount*

43. On or about August 13, 1991, the Capote Estate and Plaintiff entered into an "Option Agreement, Assignment of Copyright and Settlement Agreement" (hereinafter the "1991 Agreement") with Paramount. In the Agreement, Paramount acknowledged, among other things, that Paramount desired to distribute the Original Picture throughout the world and to obtain from Plaintiff "certain rights to produce future productions based upon the Work" in the renewal term of the copyright of the Work.

44. In accordance with the 1991 Agreement, in the event that Paramount produced a motion picture based upon Capote's Work, Plaintiff was to receive 3% of the Adjusted Gross Receipts from the picture, after initial cash breakeven, thus giving Plaintiff added incentive to make certain that the motion picture was produced.

45. The Agreement provided that there was to be an Initial Option Period (for sequel, prequel, and prequel rights) from August 14, 1991 through February 14, 1993, for which Paramount was to pay $100,000.00. In that regard, Paramount paid Plaintiff $100,000.00 upon execution of the 1991 Agreement.

46. There was also to be a Second Option Period (for sequel, prequel, and remake rights) from August 14, 1993 through August 14, 1994, for which Paramount was to pay an additional $75,000.00. In that regard, Paramount paid Plaintiff $75,000.00 on February 8, 1993.

47. After the Second Option Period expired, there was to be a six-year reversionary period (from August 14, 1994 through August 14, 2000), whereby all rights (other than the continuing right to exploit the Original Picture) reverted to Plaintiff. In yet another example of how important it was to the parties to actually get a motion picture produced, Plaintiff had six years, not to hold rights or to exercise any option, but to actually commence production of a motion picture.

48. During the Initial Option Period and the Second Option Period, the "Made for TV Series rights" were to be "frozen," as between Plaintiff and Paramount until Plaintiff's "Reversionary Period" ( III.B.). In the event that Paramount exercised one of

those options, "the Made for TV Series rights shall remain frozen as set forth in Paragraph III.B. above," (meaning that such rights were to be frozen until Plaintiff's Reversionary Period, which commenced on August 14, 1994, and Paramount had a right of first negotiation and matching rights thereafter.

49. In the event that Plaintiff did not commence production of the motion picture during that time, Paramount was to receive an additional three-year option, from August 14, 2000 through August 14, 2003, "to produce further Motion Pictures based upon the Work . . . ." This period was referred to as the "Additional Option Period."

50. Consistent with both parties' intent to get the motion picture produced and not tie up Plaintiff's valuable rights in the Work in perpetuity, the 1991 Agreement provided that, after paying the Acquisition Price of $300,000.00 at any time for the rights that were optioned, if Paramount did not produce a motion picture by the end of the Additional Option Period (August 14, 2003), then all rights regarding Capote's Work, other than Paramount's "continuing and perpetual distribution rights to the Original Picture," would revert to Plaintiff. The rights that were subject to reversion included, among other rights, sequel rights, prequel rights, remake rights, and made for television series rights.

51. Paramount paid the Acquisition Price of $300,000.00 on August 8, 1994.

52. The August 14, 2003 reversion to Plaintiff was never conditioned on *when* Paramount paid the acquisition price of $300,000.00 to Plaintiff. In fact, it was the production of the motion picture that was Plaintiff's primary concern; not when Paramount decided to write the check.

53. To be sure, there was nothing in the 1991 Agreement that expressed or implied that Paramount would have to pay more for an acquisition fee if it paid Plaintiff in 1994 (in which case, according to Paramount, it would possess the sequel, prequel, and remake rights subject to no reversion if the motion picture were not produced by August 14, 2003) than if it paid Plaintiff in 2003 (in which case, according to Paramount, there would be a reversion to Plaintiff if the motion picture were not produced by August

14, 2003), thus being of substantially less value.

54. If Paramount had even hinted that it would take the position in the future that paying the acquisition fee in 1994, rather than in 2003, would have such a catastrophic legal significance, *i.e.*, that Paramount would have the perpetual *right*, but <u>no</u> *obligation*, to produce a motion picture, Plaintiff quite clearly would never have entered into the 1991 Agreement.

55. Paramount failed to produce a motion picture by August 14, 2003. As such, any and all rights that Paramount owned in connection with Capote's Work, except for the right to continue to exploit the Original Picture, automatically reverted to Plaintiff on that date.

*Knowledge of the Parties After the 1991 Agreement*

56. Plaintiff and Paramount both understood that such rights reverted to Plaintiff on August 14, 2003. For example, in 2004, Plaintiff and Paramount discussed Paramount's possible investment in a Broadway or West End production of a musical based on the Work that the Estate had licensed because "it would also be beneficial to the continued revenues of ***the original motion picture*** to have Paramount work closely with the Trust and with any commercial producer in exploiting the rights to the musical version of "Breakfast at Tiffany's." There was no discussion of Paramount's potential investment being beneficial to any other rights in the Work, because all such rights had reverted to Plaintiff some nine months previously.

*Paramount's Interference With Plaintiff's Third Party Negotiations*

57. In or about January of 2020, Plaintiff (through his agent), opened discussions with several (ultimately numbering ten) producers concerning the production of a limited television series based on Capote's Work. All seemed to agree that a television series was the best and most strategic vehicle for a "Breakfast at Tiffany's" project.

58. Plaintiff, for many reasons, believed that it would be most appropriate to secure a female producer to produce what would basically be the story of "Breakfast at Tiffany's" character, Holly Golightly.

59. Plaintiff received numerous bids for the project that were exceptional and acceptable, with hundreds of thousands of dollars offered for up front payments, with significant seven-figure back-end payments.

60. Three or four weeks into the bidding/negotiations, executives from Paramount contacted Plaintiff's agent, requesting information about the discussions. Plaintiff's agent advised them that he had been shopping the series, and that there were a number of parties that were very interested in producing the project.

61. Paramount's executives then advised Plaintiff's agent that there was a problem with the rights. They indicated that Paramount (after 26 years) had done a "deep dive" into the rights, and determined that Paramount and Plaintiff shared in the television series rights. They then demanded that Plaintiff cease and desist from engaging in any further discussions with any third parties.

62. While Plaintiff did, in fact, accede to the demands of Paramount, he made his position clear to Paramount that the Trust, and not Paramount, exclusively owned and controlled all such television series rights. Attorneys for Plaintiff exchanged letters with Paramount's business affairs attorneys in that regard, with neither side backing down from its/his respective positions.

*Paramount's Bad Faith Negotiations Re TV Deal*

63. At one point during those exchanges, Paramount's representatives advised Plaintiff that they saw a "business solution" to the rights problem. When Plaintiff expressed a willingness to consider such a solution, Paramount asked Plaintiff's representatives for their highest bids, to which Plaintiff's representatives responded with their two highest bids. Paramount responded with a bid of its own, which was well within the range of the Plaintiff's highest bids.

64. Plaintiff and Paramount then commenced negotiations for a television co-production agreement for a made for television series, and continued the negotiations over a period of approximately two months.

65. During the entire negotiation process, Paramount continued to maintain that it owned the feature rights to Capote's Work, and insisted that Plaintiff acknowledge that in the television deal. Plaintiff maintained throughout the process that the Trust clearly owned the feature rights because Paramount did not produce the motion picture before August 14, 2003, and in fact never produced the picture.

66. Ultimately, Paramount "agreed to disagree" on the issue, and agreed to a provision in the television agreement that simply stated that the feature rights to Capote's Work were "in dispute" (and would remain in dispute).

67. Once that drafting issue was settled, the parties virtually concluded the financial and other terms of the television agreement, leaving only one or two deal points remaining, with the final conclusion of the agreement imminent.

68. However, in or about May of 2020, these negotiations came to a screeching halt when Plaintiff's agent was contacted by two Paramount business affairs attorneys, who advised him that the project had come to the attention of the Paramount features division, which decided that it "wanted the project."

69. The Features division and the Television division had made their respective pitches to the Chairman of Paramount, Jim Gianopulos, and he ultimately chose the feature project over the television project, notwithstanding the months of negotiations between the two sides.

70. Plaintiff's agent was further advised that Elizabeth Raposo, the President of Productions of Paramount, liked the "Breakfast at Tiffany's" project, that there was a screenplay at Paramount that Paramount executives liked, and that Paramount intended to sell the project to a streaming platform.

71. Paramount's business affairs attorneys advised Plaintiff's agent that Plaintiff would have to finish the negotiations with Paramount's features department, but

that he had advised the features department how much time and effort both sides had devoted to the negotiations, and how far "down the line" the parties had gone.

72. Notwithstanding the foregoing, Plaintiff's agent received a call from another business affairs attorney soon after that exchange, wherein the attorney advised Plaintiff's agent that they had reviewed the documents concerning the project, and that it was clear that the feature film rights (and all other rights) in Capote's Work were Paramount's.

73. Suddenly, Paramount terminated all discussions with Plaintiff, and took the erroneous position that Paramount had the unfettered and perpetual right to produce (or <u>not</u> produce) a feature film based on Capote's Work, to the exclusion of Plaintiff and all others, notwithstanding Paramount's complete inaction for decades since exercising an option for the project in 1994, and notwithstanding the August 14, 2003 reversion (to Plaintiff) of all rights, other than rights in the Original Picture as alleged hereinabove[1].

## FIRST CLAIM FOR RELIEF

### (For Declaratory Relief - Against All Defendants)

74. Plaintiff adopts, realleges, and by this reference incorporates, Paragraph 1 through 76, inclusive, hereinabove.

75. An actual controversy has arisen between Plaintiff and Defendants, and each of them, in that Plaintiff contends, and Defendant denies, that Defendants have no right to exploit Capote's Work in any manner other than through the continued exploitation of the Original Picture.

---

[1] Paramount claims that the only way that there could have been an Additional Option Period, so that the reversion would be triggered by Paramount's failure to produce the new feature film was if it had not already exercised another option. However, if Paramount had not exercised an option, it would have had no right to produce a new film in the first place, and the reversion (based upon Paramount's failure to produce the new film) would make no sense whatsoever.

76. Plaintiff desires a judicial determination that:

    (a) Plaintiff owns all rights, title, and interest in and to Capote's Work;

    (b) Those rights have not been sold, assigned, or otherwise transferred to Defendants, or any of them; and

    (c) Defendants have no present or future rights to sell, distribute, license, or otherwise exploit Capote's Work, or any portions or derivative works thereof, other than the continued distribution of the Original Picture.

WHEREFORE, Plaintiff prays for judgment against Defendants, and each of them, as follows:

**AS TO THE FIRST CLAIM FOR RELIEF**:

1. For a judicial determination that:

    (a) Plaintiff owns all rights, title, and interest in and to Capote's Work;

    (b) Those rights have not been sold, assigned, or otherwise transferred to Defendants, or any of them; and

    (c) Defendants have no present or future rights to sell, distribute, license, or otherwise exploit Capote's Work, other than the continued distribution of the Original Picture.

///
///
///
///
///
///
///
///
///

**AS TO ALL CLAIMS FOR RELIEF**:

    2.    For costs of suit herein incurred; and

    3.    For such other and further relief as the Court deems just and proper.

DATED: February 26, 2021

Edwin F. McPherson
Pierre B. Pine
**McPHERSON LLP**

By: */s/ Edwin F. McPherson*
    EDWIN F. McPHERSON
    Attorneys for Plaintiff ALAN U. SCHWARTZ, TRUSTEE OF THE TRUST UNDER ARTICLE THREE OF THE LAST WILL AND TESTAMENT OF TRUMAN CAPOTE DATED MAY 4, 1981